[Crim. No. 3963. In Bank.—June 16, 1936.]

THE PEOPLE, Respondent, v. FERMIN MORENO, Appellant.

S. W. Green and Guy P. Johnson for Appellant.

U. S. Webb, Attorney-General, and Wilmer W. Morse, Deputy Attorney-General, for Respondent.

WASTE, C. J.—Following his trial on a charge of murder, found by the jury to have been murder of the first degree, the defendant was sentenced to pay the extreme penalty, the verdict being without recommendation. He prosecutes this appeal from the judgment and from the order denying his motion for a new trial. His sole contention upon appeal is that the evidence is insufficient to support the judgment and that the admitted killing was perpetrated in self-defense.

We have examined the entire record and it is our conclusion that the evidence is not such as to warrant a verdict of murder of the first degree or to justify the infliction of the death penalty. However, we are not prepared to accept the defendant's contention that the homicide was perpetrated in self-defense and was therefore justifiable. Instead, and motivated solely by a desire to prevent the destruction of human life on evidence that lacks certainty as to the circumstances leading to the homicide and an admitted inability on our part to accurately and definitely ascertain therefrom the facts as they actually existed immediately prior to and at the time of the homicide, we prefer to take a middle ground, well supported in authority, and to characterize the offense as murder of the second degree. We now possess the necessary jurisdiction to reduce the degree of an offense, when the evidence requires such a course, and to direct the entry of judgment accordingly without ordering a new trial. (Section 1181, Pen. Code; *People* v. *Kelley,* 208 Cal. 387, 391 [281 Pac. 609] ; *People* v. *Howard,* 211 Cal. 322, 330 [295 Pac. 333, 71 A. L. R. 1385].)

The uncertain state of the record now before us is well exemplified by, and some support for our conclusion is found in, the frank admission appearing in the brief of the attorney-general "that the prosecution introduced evidence in its case which tended to show that the appellant killed the decedent in self defense". He points out, however, that the jury might, and apparently did, reject this particular evidence, electing to base its verdict on other evidence which he asserts supports its action.

The defendant, the deceased and the several witnesses to the fatal shooting were illiterate Mexican farm laborers who worked together by day and more or less lived together by night. They were apparently on friendly terms for the homicide was preceded by a poker game of several hours'

duration, interspersed with the consumption of wine. At approximately 10 o'clock on the evening of September 7, 1935, several of these men drew up their chairs in an effort to tempt the fickle goddess of luck. The defendant and the deceased were participants in this uncertain undertaking. According to all accounts, the game progressed without untoward happening, with the possible exception of minor diversions incidental to the pastime, until along about 3 o'clock of the following morning. Up to this point we have no difficulty in following and determining the conduct of the principal actors in the tragedy so shortly to be enacted. From this point on, however, the varying accounts narrated by eye-witnesses make anything approximating a definite conclusion as to their actions a thing to be hoped for but hardly realized.

At about 3 o'clock in the morning a dispute arose between the deceased and defendant over a poker hand that had been dealt. In the course of this dispute, and according to the two eye-witnesses called by the .prosecution, the deceased directed an ugly epithet at the defendant who remonstrated with him not to so offend him again, whereupon the defendant left the room, went to an adjoining room. returned and was about to depart. As defendant approached the door in an apparent effort to leave the building, the deceased went toward him in a threatening manner, prompting the defendant to warn the deceased "to go away and not to get close to him". The warning went unheeded as the deceased approached the defendant with one hand in his pocket. The defendant thereupon took a gun out of his pocket and pointed it at the deceased, who attempted to "grab" it and at the same time remove his (deceased's) right hand from his trousers' pocket. Two shots were fired, one of which struck the deceased, killing him almost instantly. The prosecution, in an effort to overcome the effect of this testimony of the two eye-witnesses called by it, and to impeach said two witnesses, thereupon read into evidence the testimony given by these two witnesses at the preliminary hearing. At this earlier hearing each denied having heard any quarrel preliminary to the shooting, relating merely that the deceased and defendant left the table and as they approached the door the defendant pulled out a gun and shot the deceased. Upon the trial, each of the two witnesses attempted to explain

the variation in his story upon the ground that he was intoxicated when testifying at the preliminary hearing. The prosecution, of course, offered evidence that the witnesses were not intoxicated at the earlier hearing. On its face, the story told by the witnesses at the preliminary hearing seems highly improbable. It is incredible that the defendant shot the deceased, with whom he and others had been engaged in a friendly game of cards, without some preliminary quarrel between them.

After having established its inability to locate and subpoena two other eye-witnesses, who had also participated in the card game with deceased and defendant, the prosecution read into evidence the testimony given at the preliminary hearing by said absent witnesses. At the preliminary hearing one of the witnesses testified that he was present at the shooting, that he had become intoxicated, that he heard shots but saw nothing. The other person testified at the preliminary hearing that he heard no prior quarreling but as the deceased and defendant went toward the door, the latter pointed a gun at deceased, whereupon the witness heard two shots. This latter story is also subject to the criticism that it is highly improbable that the defendant shot and killed a person with whom he worked, lived and was friendly, without some preliminary misunderstanding or quarrel.

The defendant took the witness stand in his own behalf and, after relating certain preliminary matters, testified that at about 3 o'clock in the morning a dispute arose over a poker hand; that deceased thereupon and on several occasions called him a vile name; that he told deceased to "shut up" and not to so address him; that deceased arose and replied, "I am mad and I can kill you right now"; that the deceased at the same time attempted to take a razor from his pocket; that he (defendant) thereupon left the room and got his gun from a trunk in an adjoining room and placed it in his pocket; that he returned to the room where the card game was being played and was about to leave by another door leading to the outside when the deceased approached him, repeating the epithet, and adding, "It is time to kill you anyway"; that he stepped back, took the gun from his pocket, and told deceased not to come any closer; that deceased continued coming toward him with his right hand in his

pocket; that deceased grabbed the defendant's hand and struggled with him, whereupon he shot the deceased.

Defendant also offered evidence that after the shooting, and in the presence of a constable, a razor was removed from a pocket of deceased's trousers. The person who removed it said it was open in the pocket and cut his hand slightly.

■ In substance, the foregoing represents the complete showing as to the circumstances immediately surrounding the shooting. As stated above, the record, in our opinion, does not satisfactorily disclose a wilful, deliberate and premeditated killing essential to characterize it as murder of the first degree and warrant the imposition of the death penalty. All murders not of the first degree are of the second degree. Murder in this degree is an unlawful killing with malice, but without deliberation or premeditation. (13 Cal. Jur. 603, sec. 18; *People* v. *Semone,* 140 Cal. App. 318, 323 [35 Pac. (2d) 379].) In our opinion, the homicide disclosed by the unsatisfactory record in this case falls within the latter category. We are not satisfied that the record indisputably discloses that it was executed without malice and upon such provocation and sudden passion as to reduce the offense to manslaughter.

The judgment of murder of the first degree is modified and the cause is remanded to the trial court with directions to enter a judgment against the defendant finding him guilty of murder of the second degree, and to thereupon pronounce judgment upon him as prescribed by law.

Langdon, J., Shenk, J., Seawell, J., and Curtis, J., concurred.