[Crim. No. 3545.   Second Dist., Div. One.   Apr. 6, 1942.]

THE PEOPLE, Respondent, v. GEORGE HARKNESS, Appellant.

Gladys Towles Root and Eugene V. McPherson for Appellant.

Earl Warren, Attorney General, and Bayard Rhone, Deputy Attorney General, for Respondent.

WHITE, J.—Through an information filed by the District Attorney of Los Angeles County, defendant was accused in counts I and V of the crime of kidnaping; count II charged the offense of rape; counts III and VI alleged violations of section 288 of the Penal Code; and count IV charged a violation of section 288a of the same code. To each of the foregoing charges defendant entered a plea of not guilty and also interposed a plea of not guilty by reason of insanity. Three prior felony convictions charged against him were ultimately admitted by the defendant. Trial before the court sitting without a jury resulted in the conviction of the defendant on the charges contained in counts II, III and IV. On the issue presented by the pleas of not guilty by reason of insanity, the court found that the defendant was sane at the time of the commission of the offenses as well as at the time of trial. In the offenses of which defendant was acquitted the prosecutrix was not the same child as the one involved in the counts upon which convictions resulted. This appeal is prose-

cuted by defendant from the judgments of conviction and the order denying his motion for a new trial.

Viewing the evidence in the light most favorable to the prosecution, as we are required to do following a conviction, the essential facts are: The victim of defendant's licentious conduct was a young girl six years of age, who lived with her mother, the latter of whom was employed during the evening and left for work on the date here in question at about five minutes after six o'clock, leaving her daughter in care of a housekeeper, Corrine Aseline. Mr. and Mrs. Edward Killion lived in a house located on the rear of the same lot where the prosecutrix resided. On July 15, 1941, defendant came to the Killion home about 9 or 9:30 in the morning. He was there when Mr. Killion left for work at approximately 11:30 o'clock the same morning, as he was when Mr. Killion returned from work at about 5 or 5:30 that afternoon. About that time defendant offered to go out and purchase some food if Mrs. Killion would cook it. At this time the prosecutrix came to the Killion house and stood in the doorway with her little dog. The defendant came down to the house from the garage, sat down at the table, and said to the child, "I will buy you an ice-cream cone," and patted her on the head. It was then 6:20 p. m. The girl and defendant thereupon departed. The Killions waited at their home until 7:30, but did not see the defendant again. The latter had been drinking, but was not drunk, being able to walk straight; talk coherently and without difficulty.

The child testified that she first saw the defendant at the Killion home after her mother had left for work; that the defendant told her he was going to get some hamburgers and vegetables, and invited her to come along, offering to buy her some ice cream; that she accepted the invitation and went with him. He drove to a store, where he told her he wanted to get the ice cream, but upon returning to the automobile stated that the store did not have any ice cream. Thereupon defendant and the child went for a ride to a restaurant to get a drink of Coca Cola. Thereafter they drove around for a time estimated by the child to be about ten minutes, when they parked. According to the testimony of the child, the particular spot where they parked was near some water, but not near or at the ocean. There were no houses around the spot, nor were any people present thereabouts. At the time the automobile stopped it was not quite dark. Defendant and the child got out of the automobile,

whereupon the defendant had her remove her sunsuit and panties. At that time she requested him to take her home, but he asked her to wait for a while. She testified that she then tried to start for home, but defendant would not allow her. It was at this time that the three offenses occurred of which the defendant was found guilty. In view of the obscene nature and character of the defendant's assault upon the child, we do not deem it necessary to here record the details of the offenses.

According to the child's testimony, she asked the defendant three times to take her home. After perpetrating the offenses charged against him, according to the testimony of the child, defendant drove her home, but let her out of the car approximately three houses from where she resided. Upon her arrival at her home the child was crying. The housekeeper immediately took her to the place where the mother was employed, and the matter was reported to the police. This was about 8:45 o'clock in the evening. The housekeeper testified that the child had asked to go outside about six o'clock and that approximately twenty minutes thereafter, when the housekeeper went out to search for her, the child was missing. She next saw her at 8:30 o'clock, lying on the couch crying. At the time she removed the child's garments the housekeeper noticed that the child's panties had blood on them at the crotch and that her sunsuit was very dirty and wet.

Dr. Etta Gray, examining physician from Juvenile Hall, made an examination of the child on July 17. Her findings are as follows: "A. I found a recent rupture of the hymen at the lower left side. The ruptured edges of the hymen bled readily when touched with an applicator. There was ecchymosis of the vulva and marked irritation. There was dilatation of the hymen. Q. From your examination you believe that the hymen was actually broken? A. It was." The doctor further testified that the vaginal canal had not been stretched and that in her opinion the male organ had not entered therein; that the rupture of the hymen could have been caused by a finger or fingernail.

Defendant was apprehended July 17th, and was questioned at the police station, at which time he stated that he went to visit the Killions and remained there all day; that about 6:15 o'clock in the evening Mrs. Killion sent him to the store for some groceries, and when he left he took the

girl with him, stopped at a Japanese market where he bought some vegetables, and then drove west on Imperial Boulevard to Hawthorne, where they had some ice cream. He further stated that he remained there about fifteen or twenty minutes, during which time he had a couple of intoxicating drinks; that he then left with the child in the automobile, and when he arrived near the child's home he let her out, because the child said, "Don't go in, my mother will scold you." According to his statement to the police, he then drove away without going in the house. He also stated that for some three weeks he had been drinking heavily and was not so sure as to what had happened. At a subsequent conversation the officers again questioned defendant, at which time he stated that he did remember the little girl crying, and that if she stated that he had done the things charged against him it must be so, and expressed a desire to enter a plea of guilty rather than have the child testify against him in court. He said, "I guess I did it, but I was drinking."

A police officer testified that he was familiar with the district in the vicinity of Hawthorne and around the route which defendant stated that he traveled with the prosecutrix. This officer testified that there were several bodies of water in that district and that one was located at El Segundo Boulevard west of Western Avenue about a quarter of a mile; that between El Segundo Boulevard and Imperial Highway, and between Crenshaw and Western, there were approximately fifteen such bodies of water, some of them with trees and weeds around them, and others without. All these bodies of water, it was testified, were situate in Los Angeles County.

The defendant produced a witness who operated a service station in the city of Los Angeles, who testified that about seven o'clock in the evening of July 15th the defendant was in his service station. He based the certainty of his testimony upon the fact that he had a dental appointment at eight o'clock that night and closed his station at 7:30. In connection with the testimony of this witness it was shown that he had previously been twice convicted of a felony. Further, it was shown by the records of the dentist that his appointment was at eight o'clock on July 16th and also on July 18th, but that he had no appointment for the 15th. This witness later took the stand and testified that he had been mistaken; that he actually saw the defendant on July 16th.

Taking the witness stand in his own behalf, defendant testified that on the evening in question he was at the home of the Killions; that he saw the prosecutrix standing in the yard, crying because her dog had been scratched by a cat; that he told her he was going to the store and would bring her some ice cream or candy, but Mrs. Killion admonished him not to do so, which admonition he heeded; that he left shortly after for the market, but did not take the child with him. He positively denied committing the offenses charged against him. He further testified that Mrs. Killion and he had been at the house all day, during which time he consumed the better part of three pints of whiskey; that when he left the house he went to a liquor store in an attempt to purchase additional whiskey, but did not have the money therefor; that he then went to San Pedro. He denied telling police officers of the various routes he took in the vicinity of Hawthorne. Although defendant testified as to the names and addresses of people whom he claimed to have visited on the night of July 15th, he did not produce any of these people as witnesses. With reference to his conversation with the police officers as testified to by the latter, defendant in his testimony stated that he did not talk with them, and in fact had told them that he could not converse with them because he was too ill.

■ It is first contended by appellant that the evidence touching upon the question of venue "lacks affirmative proof that the crime, if any, was committed in Los Angeles County." Briefly, the facts testified to in reference to venue are that at 6:20 p. m., July 15th, the prosecutrix was taken by defendant from 99th and Avalon Streets and returned to that place at 8:30, a period of approximately two hours and ten minutes. According to the testimony of the child, they drove for a short time, estimated by her to be about ten minutes, to a market of some sort to get ice cream. They remained there for about ten minutes. They then drove for a few minutes to a restaurant for some Coca Cola and remained there about ten minutes, after which they proceeded down the highway on to a dirt road near some water ponds, where there were trees and weeds. The drive from the restaurant to the scene of the offenses consumed about ten minutes. According to the testimony of the child, at the time the crimes were being committed, it was still a little bit light. The court was authorized to take judicial notice of the fact that sunset occurred at 7:05 p. m., all of

which circumstances point to the fact that the statement of the prosecutrix with reference to the passage of time from when she first got in the automobile until the offenses were committed is accurate.. As heretofore pointed out, it was shown by the testimony of a police officer that in the vicinity of Hawthorne, which is located in Los Angeles County, there were numerous places where there were small bodies of water surrounded to some extent by both trees and weeds. It was also shown by the testimony that the nearest point in a county outside Los Angeles would be Seal Beach in Orange County, a distance of 25 or 30 miles. Strongly supporting the testimony of the child that the locus delicti was in Los Angeles County was the testimony of the defendant, who, although denying commission of the crimes, nevertheless testified as to where he had been on the evening in question, and according to his own testimony, he never left the county of Los Angeles. Under this state of the evidence, the court was justified in drawing the conclusion that the offenses charged occurred in the county of Los Angeles. As was said by this court in *People* v. *Carter*, 10 Cal. App. (2d) 387, [52 P. (2d) 294], "The state gives no assurance to its feloniously insubordinate citizens that the venue of their crimes will be fixed beyond a reasonable doubt; that doctrine applies only to the issue of guilt. (*People* v. *McGill, ante* [10 Cal. App. (2d)], p. 155, at p. 159 [51 P. (2d) 433]; Underhill on Criminal Evidence, vol. 1, sec. 36, p. 45.) The defendant and appellant, therefore, is in no position to complain because the location of the offense was not established to a degree of certainty more to his liking."

Venue, like any other fact in a criminal case, may also be established by circumstantial evidence, and proof of venue is sufficient if the circumstances shown in evidence lead to a conclusion that the crime was committed in the county as charged. (*People* v. *Peete,* 54 Cal. App. 333, 361 [202 Pac. 51]; *People* v. *Hill,* 2 Cal. App. (2d) 141, 150 [37 P. (2d) 849].) Instead of indicating that the defendant was in any county other than Los Angeles, the only reasonable conclusion to be drawn from the testimony is that he never left that county.

Appellant does not contend that the evidence is insufficient to sustain the judgments of conviction, nor is it asserted that the testimony is so inherently improbable as to challenge belief by reasonable people; but appellant points out what he

terms "glaring inconsistencies" in the testimony given by the prosecuting witness. We have read the testimony of the prosecutrix, and we find therein nothing that would empower a reviewing court to conclude that such testimony is strictured by inconsistencies that would require the trial judge to disregard it in its entirety. This is especially true in the testimony of the child as to the immediate circumstances surrounding the cruel assaults made upon her. This alone would justify the trier of facts in concluding that the crimes charged were committed, however weak in places the testimony of the child witness may have been made to appear. Much of what we said in regard to a similar claim made by the appellant in *People* v. *Roberts,* 50 Cal. App. (2d) 558 [123 P. (2d) 628], is applicable here, and reference thereto is made for an exposition of our views concerning the power of an appellate tribunal to disturb the findings of a trial judge or jury on the ground that such findings are barren of sufficient evidence to support them because of claimed inconsistencies in the testimony. Furthermore, in the instant case it should be pointed out that there are certain proven facts and circumstances strongly tending to corroborate the testimony of the child. For instance, she and appellant were seen together on the evening in question; they left for the store to get some ice cream for the girl and supposedly to purchase some foodstuffs which were to be prepared by Mrs. Killion. However, appellant did not return to the Killion home as he had promised, but did come back into the neighborhood about 8:30 o'clock, when he let the child out of his automobile. After leaving appellant and going into her home, the prosecutrix was crying and immediately made complaint, as well as a complete disclosure of what had transpired. There was also the testimony of the Juvenile Hall physician and the condition of the child's undergarments, all corroborative of the verity of the testimony given by the prosecutrix.

For the reasons herein stated, the judgments and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1942.