[Crim. No. 5624. In Bank. Apr. 12, 1955.]

THE PEOPLE, Respondent, v. MICHAEL TIMOTHY
CAVANAUGH, Appellant.

Richard E. Adams, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, William E. James and Jay L. Shavelson, Deputy Attorneys General, for Respondent.

SCHAUER, J.—Defendant was charged by information with the murder of Ralph R. Welch, on or about July 23, 1953, and with two prior convictions of felony (issuing a check with intent to defraud and issuing a check with no account). He pleaded not guilty and not guilty by reason of insanity. A jury found defendant guilty of murder of

the first degree and made no recommendation as to penalty;[1] the jury further found that defendant was sane at the time of the commission of the offense charged. No disposition was made of the allegations of prior convictions of felony and none appears to be necessary. This is an appeal from the judgment imposing the death penalty and from an order denying defendant's motion for new trial or for modification of the judgment by reduction of the offense to second degree murder.

Defendant contends: There is no evidence that Welch was killed in San Diego County, California, as charged. There is no evidence of the circumstances surrounding the killing to show that it was murder of the first degree. Evidence of other offenses was improperly admitted over objection. Hearsay evidence prejudicial to defendant was introduced over objection. Prejudicial error was committed by the introduction in evidence of revolting and inflammatory exhibits unnecessary to the People's case. The prosecuting attorney was guilty of prejudicial misconduct in his opening statement and argument. We have concluded that the record discloses no error which, in the circumstances of this case, is ground for reversal.

In April, 1953, defendant was committed to Patton State Hospital, an institution for the mentally ill, at his own request. Defendant gave a history of asserted "blackouts" during which, without knowing what he was doing, he would leave his home and write and pass bad checks. The psychiatrist who examined defendant in connection with the commitment to Patton found no evidence of any psychosis or physical condition which would cause amnesia and did not believe that defendant "blacked out," but made the diagnosis "psychotic" because of defendant's desire for treatment at a state institution. On July 12 defendant left the hospital without a discharge and went to Chula Vista, San Diego County, where he had lived. Between July 12 and July 23 he cashed a number of bad checks.

Welch had been honorably discharged from the Marine Corps on May 28, 1953, in Tucson, Arizona. He and his wife were living in Chula Vista on July 23, 1953, the alleged date of the homicide.

On the afternoon of July 23 defendant was drinking beer

---

[1]The jury had been instructed that such a finding and omission of recommendation as to penalty would result in imposition of the death sentence.

at Thompson's Café in Chula Vista, about six miles from the Mexican border. At about 5:30 p. m. he called a cab and went to various stores where he made purchases, including a watch, and cashed or attempted to cash bad checks; he falsely represented that he was a doctor and a commander in the United States Navy. Defendant returned to the café at about 6:30 p. m. Meanwhile Welch had entered the café. He and defendant then met for the first time. They talked and drank beer together. The waitress heard Welch tell defendant that his head was bothering him and defendant say that he was a doctor in the Navy and "I will fix your head." At about 10 p. m. Welch said that he would like to go home; he had indicated where he lived; defendant said that he would go with him because he too lived "out that way." They left the café together. Welch was not seen alive again by any witness (other than defendant) who testified.

The only direct evidence as to what occurred to and between defendant and Welch during the next hour and a half consists of conflicting extrajudicial admissions and testimony of defendant, and a "confession" of defendant that he killed Welch in Tijuana, Mexico. The People take the position that defendant killed Welch but not in Tijuana; defendant takes the position that Welch was killed in Tijuana but not by him. According to defendant's testimony, he and Welch went to Tijuana in Welch's 1951 Ford convertible; in Tijuana Welch said that he wished some food; defendant went into a cantina, leaving Welch in the back seat of the car; when defendant returned after about 20 minutes Welch was naked and had been killed by blows on the head and stab wounds in the chest; defendant, apprehensive of the Mexican authorities, put the body in the trunk of the car and returned to Chula Vista.

According to defendant's "confession," as distinguished from his testimony above related, he and Welch picked up two girls in Tijuana; when defendant returned to the car after purchasing the food Welch was sexually mistreating the girl whom defendant was with; defendant became enraged and beat Welch and stabbed him with a souvenir knife which defendant had purchased; the girls vanished; defendant put the body in the trunk, threw away the knife and Welch's clothes, and returned to Chula Vista.

Defendant was next seen (by witnesses who testified at the trial) at about 11:30 or 11:45 p. m. of the same day. He

came into the Club 13, near Chula Vista, had a beer, repaid a waitress $20 which defendant's wife had borrowed, and gave the waitress $25 which he asked her to give his wife. He then decided to see his wife, drove Welch's car to her home, and they returned to the Club 13 and drank beer. They left the Club 13 a little before 1 a. m. Defendant drove his wife home. He told her nothing of Welch; he said that he would return to Patton State Hospital and left.

To show defendant's whereabouts after he left his wife and before he was apprehended the prosecution introduced evidence which disclosed that during this period defendant had committed various crimes.

Defendant was in Kingman, Arizona, on July 25, 1953. Representing himself to be Ralph Welch, he pawned the watch he had bought on the 23d and received $10.

On Sunday, July 26, in Santa Fe, New Mexico, defendant induced a priest to lend him $20 by representations that defendant was a student on his way to the University of Denver and had run out of funds.

At about 6 p. m. on July 27, 1953, defendant sent two collect wires from the Western Union office in Colorado Springs, Colorado. One was to Welch's parents in Tucson, Arizona, and one to his wife in Chula Vista. Each was signed "Ralph R. Welch" and asked for $75. Welch's wife wired the money as requested and defendant received it at the Colorado Springs Western Union office on July 28 after presenting Welch's identification. He asked the clerk to forward the other money order to Denver. She did so and defendant received and cashed it there.

On the evening of July 29, 1953, defendant and a man named Jack Jones went into a bar just outside the city limits of Denver. Defendant seemed nervous and belligerent. He attracted considerable attention by announcing that he would burn a dollar bill and doing so. Defendant and Jones left the bar shortly after 7 p. m.

At about 9:15 p. m. on July 29 Denver police officers patrolling in a radio car went to St. Luke's Hospital pursuant to a radio call. Defendant had brought Jones to the hospital; Jones had severe head lacerations and a badly mangled left hand; all his pockets were turned out. Defendant told the officers that he was Ralph Welch of Tucson, Arizona, and that while driving through Denver on his way to Columbia University he saw an injured man lying on the street, put him in his car, and obtained directions to the hospital

from a small boy. After some conversation the officers informed defendant that he was under arrest. Defendant agreed to go with the officers to the Detective Bureau. As they passed Welch's Ford defendant said that it was his. The officers said that they would look at defendant's car. Defendant said, "You're not going to check my car" and ran down the street. The officers ran after him and shouted for him to stop. When defendant continued to run they fired several shots. One bullet hit defendant in the left buttock and he fell. Defendant was abusive and hostile; the two officers had to hold him. Other police and an ambulance arrived and defendant was taken to a hospital.

On the back seat and back floor and in the trunk of the Ford was putrefying blood. On a jack found in the car was putrefying blood and also fresh blood. A tooth, part of a dental bridge, hair, and sun glasses, all subsequently identified as Welch's, were found in the car. In defendant's pockets were $178, a table knife, a bank book of Jack Jones, Welch's wallet with his certificate of discharge from the Marine Corps and his Arizona driver's license, and blank checks from the Chula Vista branch of the Bank of America.

The Denver police ascertained that Welch was missing from Chula Vista. They questioned defendant repeatedly. On July 30, 1953, defendant said that he was Michael Timothy Cavanaugh of National City, California, that he had never heard of Welch, and that he had no recollection of what had happened to him on the night of July 29. On July 31 defendant denied that he had known Jones or Welch or had anything to do with Welch's car. On August 3, taken to look at Welch's car, defendant said that it smelled as if it had contained a body but that he could not recall having seen the car before. On the 4th and 5th defendant continued to deny that he had ever seen Welch. On August 6 an officer told defendant that the authorities believed defendant had killed Welch and that they were anxious to locate his body, and asked defendant whether he would submit to questioning under the influence of "truth serum." Defendant agreed to such a test and it was performed on the afternoon of August 7.

Sodium amytal was administered intravenously and defendant was questioned by a psychiatrist in the presence of police officers. A transcript of what defendant said was made but not offered in evidence. Defendant testified that he recalls being at the hospital and receiving an injection at the be-

ginning of the test, that he then lost consciousness and has no knowledge of what took place until he regained consciousness in the county jail the next morning.

After the questioning of defendant during the sodium amytal test ended on August 7, 1953, an officer drove defendant to the jail. During their drive defendant gave an account of Welch's death on July 23 like that in his testimony, *supra*, page 282. Defendant said that he intended to take the body from Tijuana to the Chula Vista police; after he crossed the border he thought he should get the advice of his wife but when he met her he did not mention Welch; he then decided to take the body to Welch's parents in Tucson; instead he drove through Kingman and into New Mexico; he planned to turn the body over to the police in Albuquerque but became frightened; by this time the body smelled so bad that he felt he had to get rid of it; he drove off the road into the desert, left the body covered with defendant's coat, and said a prayer or two; he then went on through Santa Fe, borrowing money from the priest, and Colorado Springs, wiring Welch's parents and wife for money, and to Denver, as hereinbefore described; while he was drinking at a Denver night club on the evening of July 29 he met Jack Jones; defendant and Jones went to various night clubs, drinking heavily; they met two "fast" girls; Jones took one of the girls to the car to "have a party"; after about 30 minutes defendant went to the car and found Jones with his head beaten; defendant became frightened; he asked a small boy directions to a hospital; at St. Luke's defendant did not want to be involved with the police because of his possession of Welch's car, tried to flee, and was shot and apprehended.

From defendant's account of where he left Welch's body the Denver police gave the Albuquerque authorities information which enabled them to find the body. It was so decomposed and eaten by vermin that the physician and pathologist who performed the autopsy could not determine the cause of death. The greater portion of the flesh and inner organs had been eaten away and the organs could not be identified. There were large holes in the chest wall; their primary cause could not be determined. The upper jaw was fractured in seven or eight places. Insofar as autopsic conclusions are concerned, death could have been from natural causes, from multiple stab wounds, or from a severe beating about the head and face. Enough skin remained on three fingers to enable the taking of fingerprints; comparison of these with

Welch's Marine records established identity of the body. There is no contention that the evidence as a whole fails to establish that Welch came to his death by criminal means; defendant's own testimony is to this effect.

On August 8, 1953, defendant, again questioned by the Denver police, said he remembered nothing of what occurred the day before. Defendant was returned to California in August but was not charged with the murder of Welch until February 25, 1954. On October 21, 1953, sodium amytal was again administered intravenously and a psychiatrist questioned defendant concerning the death of Welch. The results of this questioning were not offered in evidence. The psychiatrist testified that in his opinion defendant during the questioning was controlling his answers and shamming.

On November 16, 1953, defendant was being tried before Judge Dean Sherry of the San Diego Superior Court for issuing checks without sufficient funds. Defendant's attorney stated in open court that defendant wished to make a statement to Judge Sherry in the presence of the district attorney and outside the presence of the jury. The ensuing proceedings in chambers were reported by a stenographer. Defendant was not coerced and no promises were made to him. He said, "It is my opinion I am in this court at this time for something I actually don't know, and I can't quite understand . . . being punished for something I do not know. I would much rather be punished for something that I do know . . . I make the statement of my own free will and stand set to accept any consequences that may follow. Here, I have a slip of paper and my own signature . . ." Defendant then read from the paper, "I, Michael T. Cavanaugh, do admit by this self-written document that on July 23, 1953, at Tijuana, Mexico, I, Michael T. Cavanaugh, did kill one Ralph Welch as an aftermath of an argument resulting from a drunken orgy. Signed: Michael T. Cavanaugh."

Defendant proceeded to make the "confession" summarized *supra,* page 282. Defendant said that he was so enraged by Welch's asserted mistreatment of the girl that he cut off Welch's penis. (Actually, this had not been done to Welch's body.) After defendant completed his "confession," he said insistently that his claimed "blackouts" while writing checks were real; "I have no knowledge of writing the checks that you have charged me with . . . I just can't seem to be found guilty of something I don't know, and I would much rather have them shoot me for something I do know." Asked,

"[I]n respect to the Welch affair . . . , do you contend that you were under any blackout conditions?" defendant replied, "No, sir. I did not state that. . . . I am not making any contention . . . that at the time I was in a blackout . . . I just simply blew my top."

The Mexican correspondent for a San Diego paper, who acted as interpreter at interviews between defendant and the chief investigator for the Tijuana police force, in November, 1953, testified for the People that defendant made various statements as to where he had killed Welch and where he had disposed of Welch's clothes and the knife; the Mexican authorities checked each of defendant's stories, attempted unsuccessfully to find the girls whom defendant said he and Welch had picked up and to find anyone who had seen defendant in Tijuana, and found no evidence that a killing had been committed in Tijuana on July 23, 1953.

Patrick O'Riley (who had testified for the People at the preliminary hearing and who was subpoenaed by both the People and defendant) testified for defendant at the trial as follows: He met defendant in the San Diego jail in November, 1953, and for two months they were cell mates. They corroborated in preparation of the "confession" which defendant made to Judge Sherry because they thought that defendant might receive a light sentence if he were tried for a homicide in Mexico. When flaws in the story were revealed by investigation of the Mexican authorities they changed the story in attempts to cover up the discrepancies. O'Riley was playing diverse roles while he was in jail with defendant: he was dealing with defendant in what defendant believed was a good faith attempt to enable defendant to obtain lighter punishment; he was passing out information to confuse the Mexican authorities; and he was working with the California authorities to get a confession from defendant. Defendant at no time told O'Riley that he had actually killed Welch or that he knew that Welch was killed in California.

As previously stated, defendant's testimony at the trial was that he and Welch went to Tijuana, that he left the car for a short time and found Welch's body when he returned. Defendant repeatedly stated on the stand that he would only testify as to the killing of Welch; he said that he would not answer questions as to past prosecutions or as to where he got the money which he had at Thompson's Café on the afternoon of July 23; asked why he wired Welch's

parents and wife for money, he replied that he would only answer as to the killing of Welch in Mexico.

A witness testified for defendant that as an experiment he had made a trip to Tijuana similar to the one described in defendant's testimony, starting from Thompson's Café at 10 p. m., stopping as indicated by defendant in his testimony, returning across the border, and reaching the Club 13 at 11:26 p. m.

Defendant, as previously stated, urges that there is no evidence that Welch was killed in California. Section 27 of the Penal Code provides in material part that "The following persons are liable to punishment under the laws of this state: 1. All persons who commit, in whole or in part, any crime within this state . . ." Section 790 provides in material part, "The jurisdiction of a criminal action for murder or manslaughter is in the county where the fatal injury was inflicted or in the county in which the party injured died or in the county in which his body was found . . ."

At the close of the People's evidence on the issue of guilt defendant moved to dismiss on the ground that there was no evidence of jurisdiction, and after defendant rested he moved for an advised verdict on the ground of lack of proof of venue or jurisdiction. These motions were denied.

The jury were instructed that "in order to convict the defendant you must find by a preponderance of the evidence that the fatal injury was inflicted upon Ralph Welch by the defendant in San Diego County, or that Ralph Welch died in San Diego County as a result of the injuries inflicted by the defendant. . . . Guilt, as I have repeatedly said to you, must be proven beyond a reasonable doubt. . . . As to the place of the commission of the crime, the law merely requires that it be proven by a preponderance of the evidence . . ."

The instruction to the effect that territorial jurisdiction could be established by a preponderance of the evidence was correct. (*People* v. *Megladdery* (1940), 40 Cal. App.2d 748, 766 [106 P.2d 84]; *People* v. *Guernsey* (1947), 80 Cal.App.2d 463, 466 [180 P.2d 27].) And such jurisdiction, like any other fact, can be shown by circumstantial evidence. (*People* v. *Hill* (1934), 2 Cal.App.2d 141, 151 [37 P.2d 849]; *People* v. *Harkness* (1942), 51 Cal.App.2d 133, 139 [124 P.2d 85].)

Here the jury could infer that the killing occurred in California from the following circumstances: Defendant and Welch left Thompson's Café at 10 p. m. and defendant

arrived at the Club 13 in Welch's car at 11:30 or 11:45. According to a witness for defendant who made an experimental trip to and from Tijuana similar to that described in defendant's testimony, such trip took one hour and 26 minutes. According to defendant's testimony he was able to move Welch's bleeding body from the back seat of the car into the trunk without getting blood on his clothes, and he wiped the blood from the car with a rag. According to defendant, he was frightened when he brought the body across the border; he testified, ''[I] held my breath while the man asked me where I was born and had I bought anything and he shined his light in the front seat and in the back and just passed me through.'' There is no evidence that defendant attracted attention during the check of cars which pass the border.[2] Defendant's wife saw no blood in the back seat when she looked there shortly after defendant's return, and defendant himself was not blood-stained or disheveled. It is a reasonable conclusion that he would not have had time to make the trip to Tijuana as he testified and still to have moved the body, naked and bleeding as he claims, from the back seat to the trunk without leaving traces of blood which would have been observed by border guards, and that therefore he and Welch did not leave this state or San Diego County. The evidence that defendant believed he would receive a lighter punishment if he were tried in Mexico lessens the credibility of his statements which place the crime in that country.

Defendant asserts that the prosecuting attorney in argument admitted that the People had not proved venue. He refers to counsel's statement that ''Mr. Adams [attorney for defendant] says that we haven't told you exactly where it [the location of the killing] is, and I think the Judge is going to instruct you in that regard. I don't know where it is. It is going to be locked in this man's heart, probably forever.'' This was not an admission of a failure of proof. The statement was properly made in the course of argument that the place of killing could be inferred.

[2] A United States immigration inspector who was on duty at the place where defendant testified he crossed the border on the night of July 23, 1953, described the procedure of checking persons who come into the United States in automobiles. Entrants are questioned and at night the inside of their cars is examined by flashlight; if they appear intoxicated they are stopped; if they are nervous or the questioning officer's suspicions of illegal entry or customs violation are otherwise aroused they are detained for more thorough interrogation and search.

Much of the evidence of defendant's activity both before and after the killing of Welch tends to show the commission of crimes other than the one for which he was on trial. Defendant argues that the evidence of other crimes was not relevant to the crime charged and served no purpose except the improper one of prejudicing defendant. ■ Both defendant and the People recognize the correctness of the statements of law as to evidence of other crimes quoted in *People* v. *Newson* (1951), 37 Cal.2d 34, 47 [230 P.2d 618], from *People* v. *Dabb* (1948), 32 Cal.2d 491, 499, 500 [197 P.2d 1]: ''A defendant in a criminal action cannot be required to defend himself against the charge of any crime other than that for which he is on trial, but this rule does not exclude evidence which incidentally discloses the commission of another offense. Evidence which is relevant in establishing guilt of the crime charged is admissible notwithstanding the fact that it tends to connect the accused with an offense not included in the charge. [Citations.] . . . ■ The relevancy of evidence that proves crimes other than that charged must, of course, be examined with care, due to the prejudicial nature of all such evidence, and it should not be admitted simply on the showing that some part of that transaction is relevant to the case. The possibility of severing relevant from irrelevant portions should, in every case, be considered, thereby protecting the defendant against reference to other crimes where it has no tendency to establish facts pertinent to the proof of the crime charged.'' (To the same effect see *People* v. *Peete* (1946), 28 Cal.2d 306, 314-315 [169 P.2d 924]; see also Fricke, California Criminal Evidence, 2d ed. (1950), p. 223.)

Defendant urges that the persons who observed his activities in Chula Vista prior to his meeting with Welch could have testified to his presence in the town without describing his cashing of worthless checks and his falsely impersonating a naval officer, and that his flight after the killing could have been shown by witnesses testifying simply that they saw him in Kingman, Albuquerque, Colorado Springs, and outside Denver, without describing the crimes he committed there (pawning the stolen watch, criminally obtaining money from the priest and from Welch's relatives, and mutilating United States currency).

The People urge that the evidence that defendant escaped from a state mental hospital (not a crime; see 18 Cal.Jur.2d, pp. 251-252) and passed bad checks prior to the homicide was relevant to show a motive for the homicide; i.e., that he

desired to escape from the neighborhood where he had done these improper things and that therefore he killed Welch to obtain his automobile and identification papers. And the People argue that the evidence that after the homicide defendant pawned the watch which he had obtained by writing a forged check and defrauded a priest tends to show defendant's need for money and thus tends to show that thereafter, still needing money, he attacked Jones in order to rob him; and the crimes against Jones in turn tend to show that defendant killed Welch for the purpose of taking his property.

■ We do not believe that, according to logic and experience, the evidence of defendant's escape from the hospital and of his nonviolent crimes sufficiently tends to show a motive for or has enough relevance toward proving the violent robberies and the killing of Welch to have been properly admitted. (See *People* v. *Glass* (1910), 158 Cal. 650, 654-659 [112 P. 281].) However, we have concluded that in the circumstances the admission of such evidence did not prejudice defendant or result in a miscarriage of justice. (Cal. Const., art. VI, § 4½.) Consideration of the comparatively minor offenses against property could hardly have influenced the jury one way or the other in their appraisal of the evidence as to the crime against life.

■ The evidence tending to show the more serious offenses of battery and robbery of Jones was relevant because of the striking similarity in significant respects between defendant's conduct in that case and in the case of Welch, tending to indicate in each case a purpose of defendant to acquire the property of a casual drinking acquaintance by force. (See *People* v. *Peete* (1946), *supra*, 28 Cal.2d 306, 318.) In each case there is evidence tending to show that defendant viciously attacked and robbed a victim with whom he had become acquainted when they drank together in a bar; in each case defendant told a rather implausible story of his drinking companion being in the car for a short time with a girl or girls whom he and defendant had "picked up" and of defendant returning to the car to find the victim bloody and beaten; and in each instance defendant was thereafter in possession of property of the victim. ■ In this connection it should be observed that while it is often said that evidence of similar crimes is relevant to show plan, scheme, system, or design, this is not to be understood as meaning that such evidence is admissible only if it tends to show premeditated, calculated design; it also is relevant and may be admissible

where, as here, it tends to show that defendant was guilty of the crime charged by showing a peculiar or characteristic behavior pattern of defendant which is manifest in the conduct of the transgressor in both crimes. (See *People* v. *Burns* (1952), 109 Cal.App.2d 524, 535-538 [241 P.2d 308, 242 P.2d 9].)

Defendant argues that this is a case where the evidence of the circumstances leading to the homicide is so uncertain that at the most it can be said only that defendant killed deceased and that therefore the finding that the killing was murder of the first degree should not be upheld (citing *People* v. *Howard* (1930), 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385] ; *People* v. *Moreno* (1936), 6 Cal.2d 480, 481 [58 P.2d 629]). Contrary to defendant's argument, the evidence which has already been related is sufficient to show that the jury could find that defendant murdered Welch in the perpetration of robbery, as shown by his subsequent possession of Welch's property and his posing as Welch (see *People* v. *Watts* (1926), 198 Cal. 776, 788 [247 P. 884]), and that therefore the murder was of the first degree. (Pen. Code, § 189; see also *People* v. *Thomas* (1945), 25 Cal.2d 880, 895, 899 [156 P.2d 7] ; *People* v. *Bender* (1945), 27 Cal.2d 164 [163 P.2d 8] ; *People* v. *Valentine* (1946), 28 Cal. 2d 121, 135-136 [169 P.2d 1, 167 A.L.R. 675] ; *People* v. *Honeycutt* (1946), 29 Cal.2d 52, 59 [172 P.2d 698] ; *People* v. *Peterson* (1946), 29 Cal.2d 69, 71 [173 P.2d 11].)

Defendant's argument. that he was prejudiced by the use of hearsay testimony involves the peculiar contention that defendant's own extrajudicial statements are inadmissible hearsay. Although such statements are evidence which tends to prove the truth of the matter stated, they constitute admissions and are not vulnerable to the hearsay objection; also, evidence of defendant's self-contradictions was admissible to impeach him as a witness. (*Bonebrake* v. *McCormick* (1950), 35 Cal.2d 16, 19 [215 P.2d 728] ; *People* v. *Southack* (1952), 39 Cal.2d 578, 585 [248 P.2d 12] ; see also 4 Wigmore, Evidence, 3d ed. (1940), § 1048.)

Defendant argues that the prosecution improperly used evidence, unnecessary to the proof of the case against defendant because cumulative, which was calculated, and could tend, to inflame the passions of the jury. The pathologist who performed the autopsy cut off the three fingers which formed the basis of fingerprint identification of Welch and they were introduced in evidence. There is testimony that

the body when found was in a revolting condition, badly decomposed, much eaten by vermin, and crawling with maggots. Photographs of the body were introduced in evidence. There was much testimony as to the smell of putrefying blood which was about Welch's car and articles found therein. Such articles (gravel, a blood-stained leather sleeve, a jack, a blood-stained seat cover, a tooth, the car itself) were introduced in evidence.

 Generally, "except in rare cases of abuse, demonstrative evidence that tends to prove a material issue or clarify the circumstances of the crime is admissible despite its prejudicial tendency." (*People* v. *Adamson* (1946), 27 Cal.2d 478, 486 [165 P.2d 3].) This rule is another application of the principle, applied in the case of evidence of other crimes, that relevant evidence is not necessarily inadmissible because of its tendency to prejudice the jury. The admission of gruesome and horrifying photographs and objects, over objection, has been repeatedly upheld by this court under the circumstances of the particular case (*People* v. *Gomez* (1930), 209 Cal. 296, 300 [286 P. 998]; *People* v. *Harris* (1934), 219 Cal. 727, 730-731 [28 P.2d 906]; *People* v. *Shaver* (1936), 7 Cal.2d 586, 592 [61 P.2d 1170]; *People* v. *Goodwin* (1937), 9 Cal.2d 711, 714 [72 P.2d 551]; *People* v. *Lisenba* (1939), 14 Cal.2d 403, 411-412 [94 P.2d 569]; *People* v. *Smith* (1940), 15 Cal.2d 640, 649 [104 P.2d 510]; *People* v. *Dunn* (1947), 29 Cal.2d 654, 659-660 [177 P.2d 553]; *People* v. *Isby* (1947), 30 Cal.2d 879, 892 [186 P.2d 405]; *People* v. *Guldbrandsen* (1950), 35 Cal.2d 514, 521-522 [218 P.2d 977]; *People* v. *Osborn* (1951), 37 Cal.2d 380, 383 [231 P.2d 850]; *People* v. *Reed* (1952), 38 Cal.2d 423, 432 [240 P.2d 590]), although it has occasionally said, of shocking evidence which was relevant but unnecessary to establish the People's case, that "the prosecution is not to be commended for offering it in evidence" (*People* v. *Burkhart* (1931), 211 Cal. 726, 732 [297 P. 11]; *People* v. *Sisson* (1934), 1 Cal.2d 510, 511 [36 P.2d 116]; *People* v. *Madison* (1935), 3 Cal.2d 668, 679 [46 P.2d 159] ["Although we cannot give sanction to the practice of exhibiting unnecessarily to the jury gory physical evidences of the crime which are calculated or likely to inflame the jury's deliberations, nevertheless we cannot say that the exhibition during the trial of the bed or bedding [in which deceased was slain] . . . necessarily was beyond propriety or had that effect. The questions whether the exhibit should remain and was

needed to substantiate and illustrate the expert and other testimony as to the shots fired and whether it would tend to inflame the jury to the prejudice of the defendant, were questions addressed in the first instance to the discretion of the trial court'']; see also *People* v. *Logan* (1953), 41 Cal.2d 279, 285 [260 P.2d 20] [error, but not prejudicial, to admit photographs of defendant with bleeding victim at scene of crime, and of defendant with a baseball bat and the purse of victim at police station; ''it is not apparent how the jury would be aided in solving the facts of the case by pictures showing defendant in the presence of the victim. . . . [The several relevant matters pictured together] could have been shown without the graphic connection of defendant and the victim which resulted from photographing them together'']).

One California case has been found in which it was held that admission of gruesome photographs of the victim of a homicide was an abuse of discretion and because of this and other errors the judgment of conviction was reversed. (*People* v. *Burns* (1952), *supra,* 109 Cal.App.2d 524, 541-542.) The photographs were made after the autopsy. They were particularly horrible, and not a representation of the condition of the victim when she died, because in connection with the autopsy the head had been shaved and wounds and incisions made. The court said that admission of the photographs improperly crossed the line between ''a photograph which is of some help to the jury in solving the facts of the case and one which is of no value other than to inflame the minds of the jurors.''

Here no useful and proper purpose was served by emphasizing to the jury, by repeated testimonial and photographic description, the horrible condition in which the body was because of its having been left on the desert. No useful and proper purpose was served by introducing in evidence the fingers of deceased. The purpose for which they were received, identification, could be and was accomplished by testimonial evidence of a fingerprint expert. Without such testimony the fingers would have meant nothing to the jury. With such testimony, they were unnecessary. The use of this evidence, like the use of the irrelevant evidence of other nonviolent crimes, in the manner and extent to which it was done, was improper and erroneous. Nevertheless, by the mandate of section 4½ of article VI of the Constitution of California, we may not reverse a judgment unless we conclude,

after examination of the entire record, that there has been a miscarriage of justice. Such examination of the record here leaves us with the view that upon the evidence lawfully adduced, and notwithstanding that improperly presented, no miscarriage of justice is shown. In a closer case the misconduct related could well deprive the defendant of a fair trial and require reversal of the judgment.

Defendant's further contention that the district attorney was guilty of prejudicial misconduct in oral argument to the jury is without merit. Neither the portions of the argument specifically directed to our attention by defendant's counsel nor other portions thereof are improper except in one respect. That exception is the argument that defendant's nonviolent crimes against property tend to show that defendant was the sort of person who would viciously beat a person in order to rob him. This argument is not an improper appeal to passion; rather, it is improper reasoning, and resort to it might well tend to weaken rather than strengthen the case of the prosecution. But however it be viewed, as previously indicated we have concluded that, in all the circumstances of the case, the presentation of this theory to the jury did not, by itself or cumulatively with other errors, result in a miscarriage of justice.

For the reasons above stated, the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Once again a majority of this court has permitted the use of evidence of crimes other than the one for which the defendant was on trial. As I said in my dissent in *People* v. *Westek,* 31 Cal.2d 469, 484 [190 P.2d 9], where the evidence of other crimes was offered by way of impeachment, ''While the majority base their holding in this case, that evidence of other crimes was admissible, upon the ground that such evidence was offered by way of impeachment, the effect is just the same as if it had been offered as a part of the prosecution's case in chief [as here]. If it would have been immaterial and irrelevant as part of the prosecution's case in chief, it was likewise immaterial and irrelevant as impeaching evidence.'' I said there that ''lip service'' was paid to the general rule but that the majority was in effect abrogating

the rule. That has been done in the instant case where the rule is quoted at length as it was set forth in *People* v. *Dabb*, 32 Cal.2d 491, 499, 500 [197 P.2d 1], and then with legal dexterity, part of the evidence so admitted is held not prejudicial and the balance thereof is imaginatively held to be relevant ''because of the striking similarity in significant respects between defendant's conduct in that case and in the case of Welch. . . .'' There is no such similarity. The difference between the forgery of a check and murder should be apparent to almost anyone. Many people suffer from a need for money without resorting to murder to satisfy that want. There is also a great difference between assault and battery, and murder. This evidence was only admitted for its inflammatory effect and to say that it shows a ''peculiar or characteristic behavior pattern of defendant which is manifest in the conduct of the transgressor in both crimes'' is sheer sophistry. The only thing the prosecution needed to prove was where defendant had been prior to his arrest and that could have been done quite simply by witnesses who said merely that they had seen him in the various locations. There was no necessity of admitting evidence of alleged crimes committed by him in those locations and the only result to be achieved was that of prejudicing the defendant in the eyes of the jury—the precise thing the rule of inadmissibility of evidence of other crimes was designed to prevent. Nothing could be more prejudicial! I have fully set forth in other dissents the reasons why evidence of other crimes should not be admitted (see *People* v. *Peete*, 28 Cal.2d 306, 322 [169 P.2d 924]; *People* v. *Zatzke*, 33 Cal.2d 480, 486 [202 P.2d 1009]; *People* v. *Westek*, 31 Cal.2d 469, 483 [190 P.2d 9]; *People* v. *Dabb*, 32 Cal.2d 491, 501 [197 P.2d 1] [concurring opinion]) and it would be unnecessarily repetitious to repeat here what I stated in those cases.

I also disagree with the holding of the majority that venue was proved by a preponderance of the evidence. The only evidence leading to jurisdiction is the inference that time did not permit defendant's story to be true. This inference is based on witness' testimony that defendant left the café at 10 p. m. and returned at either 11:30 or 11:45 p. m. and testimony that the driving time to and from Tijuana would be one hour and 26 minutes; that defendant could not have moved the body in 19 minutes. It appears to me that this inference is a far cry from the preponderance of proof of venue required for jurisdiction.

I also disagree with the majority holding that the admission in evidence of the dreadful and horrible objects and photographs did not constitute prejudicial error. I agree that it could serve no useful or proper purpose—I also agree that its *only* purpose was to prejudice defendant in the interest of securing a conviction by any means.

The majority has here condoned two highly prejudicial errors in the instant case: That of admitting in evidence testimony of other crimes allegedly committed by the defendant; and photographs and objects which no normal or reasonable person could view without revulsion and hatred for the one who had, allegedly, committed an act bringing about such a vile result. The first error could have had no other purpose than to tell the jury what a bad person the defendant was and had been; the other error would insure the result desired by the prosecution—that defendant be shown no sympathy by a horrified and inflamed jury. Under the facts of any case, no matter what the record showed, these errors would be prejudicial. In addition, we have the extremely dubious showing of venue. It appears to me that if we do not honestly recognize the prejudicial nature of such errors and move to correct them, we shall be guilty of condoning such practices in the future and will, ultimately, deprive those accused of crime of due process of law in its most practical sense.

I would therefore reverse the judgment.

TRAYNOR, J.—I dissent.

Had it been necessary for the jury to determine only whether defendant killed decedent in the perpetration of a robbery, I could agree that the errors committed at the trial were not prejudicial. The jury was also presented, however, with a very close question whether the crime was committed in California, and it was required to determine the penalty that should be imposed. The majority opinion concedes that unnecessary but highly inflammatory evidence and evidence of other crimes was erroneously admitted, and it is apparent from the record that the prosecutor deliberately presented his case with the purpose of inflaming the jury. I cannot say that he did not succeed in this purpose or that a different verdict would have been improbable had the evidence been excluded. (*People* v. *Bemis*, 33 Cal.2d 395, 401 [202 P.2d 82]; *People* v. *Newson*, 37 Cal.2d 34, 46 [230 P.2d 618].)

Accordingly, the judgment and order appealed from should be reversed.

Appellant's petition for a rehearing was denied May 11, 1955. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.