[Crim. No. 7002.   Second Dist., Div. Four.   Dec. 26, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. BENNIE WILL MEYES, Defendant and Appellant.

Marvin Mitchelson, under appointment by the District Court of Appeal, and Burton Marks for Defendant and Appellant.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, P. J.—Bennie Will Meyes and William Douglas were charged by indictment with the murder of Gene T. Nash, a sergeant of the Los Angeles Police Department. Defendant Meyes was also charged with three prior felony convictions in Los Angeles County: burglary in January 1948, robbery in November 1950 and robbery in January 1951. Meyes admitted the three priors charged. A first jury trial resulted in a mistrial, the jury having been unable to agree upon a verdict.

In the second trial the jury found Meyes guilty of the crime of murder as charged and fixed the degree as murder of the second degree. Defendant Douglas was found not guilty. The three prior convictions charged against Meyes were found to be true, probation was denied and Meyes was sentenced to state prison for the term prescribed by law. A hearing was held to determine whether or not Meyes was an habitual criminal under section 644, subdivision (a) of the Penal Code. He was found to be an habitual criminal. Meyes was sentenced to state prison for the term prescribed by law, which sentence was ordered to run consecutively to the sentence he was then serving.

This appeal is from the murder conviction and from the order adjudicating Meyes an habitual criminal.

On October 20, 1958, Police Sergeants Bitterolf, Eastenson and Nash and Officer Leonard of the robbery detail commenced a search for defendants Meyes and Douglas. There was a felony warrant outstanding for Meyes arising out of a robbery of a gambling game. The officers also had information that defendant Douglas was connected with the robbery. The officers received information that the two defendants could be found at 2723 Budlong Avenue in Los Angeles. They arrived at approximately 8:30 in the evening. Sergeants Bitterolf and Nash went in the front door of the apartment house and the other two officers remained outside. Sergeant Bitterolf knocked on the door of apartment number two. Both officers had drawn their revolvers and had taken out their identification badge cases from their pockets. The door was answered by a person later learned to be Virgil Lee. Sergeant Bitterolf said that he was a police officer and asked if "Bill" was there. Defendant Douglas was known by the name "Bill." The sergeant spoke in a tone of voice a little louder than ordinary. Lee responded that there was no one there by the name of "Bill." Sergeant Bitterolf said he would like to come in and look around and pushed Lee ahead of him at which point Lee invited the officers in.

There were several persons in the living room watching a television set which was turned on. Bitterolf started questioning each of the occupants as to his name and if "Bill" was there. Bitterolf turned the television set off in order to hear their answers. While questioning the occupants, Bitterolf observed that Sergeant Nash went back toward the entrance hall they had entered. As he observed Sergeant Nash disappearing back down the hallway he heard sounds which were like a doorknob being operated or a door being rattled. He then heard footsteps which decreased in volume away from the area. He next heard eight or ten gunshots in rapid fire, the sounds coming from the end of the hallway.

Sergeant Bitterolf immediately left the living room and went down the hallway toward the back bedroom. He observed it was lit by a single ceiling light. The door was open. He entered that room. He observed no one in the room and going through another door entered a bathroom. He observed no one in the bathroom but saw a light coming from a front bedroom and entered this room. Upon entering the room he saw Sergeant Nash lying on his back on the floor

alongside of the bed with his feet projecting into the area of the doorway. Sergeant Bitterolf observed that Sergeant Nash had a wound on his left hand between the thumb and forefinger and two wounds in his body, one above and one below his belt line. Sergeant Nash was holding his .38 caliber revolver in his right hand. Approximately five seconds had elapsed from the time Bitterolf first heard the shots until the time he was in the front bedroom with Sergeant Nash. Bitterolf stated to Nash, "How is it, Gene?" Nash responded to the effect that he had been hit "real bad." Nash told Bitterolf that there had been two people; that the one who had shot him had gone out the window and the other one was in the closet.

Sergeant Eastenson kicked his way into the room through one of the doors. Bitterolf told Eastenson that Nash had been shot and to get an ambulance. Eastenson left. Bitterolf checked the other side of the bed and went over to the bedroom closet. He pulled the door open and found defendant Douglas lying doubled up on the floor of the closet. Bitterolf pulled Douglas partly out of the closet and checked the area for weapons. He first thought Douglas was dead. He left the bedroom, entered the living room and searched Herman Cosby and Virgil Lee for weapons and made them sit on the floor. He then returned to the bedroom and talked to Sergeant Nash again. He told Nash to relax; that an ambulance was on its way. Nash responded, "Don't kid me; I know I am done for. I know I am going to die; you cancel the ambulance or don't get an ambulance for me."

Bitterolf noted Douglas' eyes were open watching him. He also noted a small child lying at the foot of the bed. He first thought the child dead but it developed the child was not injured.

After the ambulance crew arrived and removed Sergeant Nash, Sergeant Bitterolf observed that one of the windows of the bedroom was open with a part of the curtain outside of the window. He observed a shoe, a gun and a window screen on the ground outside of the window. He then had a conversation with defendant Douglas, and thereafter an ambulance came and picked up defendant Douglas.

Richard A. Barlow, a police officer attached to the homicide division, responded to a radio call to the same address at approximately 9 :30 p. m. In the areaway between the wall and the building he found an oxford shoe and a revolver. Upon examining the revolver he found six empty cartridges.

Sergeant Eastenson who left the apartment to place a radio call for the ambulance and to notify headquarters of the shooting then returned to the scene. He observed the window screen, shoe and revolver and also blood spots in the same area. He followed the blood spots to a fence and went over it through the adjoining property to Van Buren Street; then to 27th Street where the blood spots came to a stop alongside a 1950 black Buick. He observed defendant Meyes lying on the floor on his back in the front seat area.

Meyes was taken to the receiving hospital and en route he denied shooting Officer Nash. He stated that he had occasion to be at the Douglas apartment and was talking to somebody; that he then went in and lay down on Douglas' bed. He said Douglas came home later and that they had a short conversation and then went into the bedroom. He told Officer Rafferty, who accompanied Meyes to the hospital in the ambulance, that while in the bathroom he heard a "voice of authority" and ran into the bedroom and tried to get under the bed. When Officer Rafferty asked him why he ran defendant Meyes said he knew he "was hot." He explained to Officer Rafferty that he was a parole violator for robbery and gave the name and location of his parole officer. Meyes said there was a "lot of shooting" and that he made it out the window; that he first knew he himself had been shot after he got out of the window and tried to get over a fence.

Meyes denied having a gun at any time, but said he knew Douglas had two guns, one of which he described as a .38 and that it was like a policeman's gun. He said that Douglas kept the police gun under the pillow of his bed. He said he didn't know who shot the officer "but it wasn't him." Meyes stated he did not know when he had been shot in the finger and didn't know until after he was arrested that he had been shot there. A surgeon of the Los Angeles City Receiving Hospital testified that defendant Meyes had a gunshot wound in the upper left thigh which appeared to travel from the back of the thigh to the front, a gunshot wound through the fifth finger of the right hand and a cut on the upper lip.

The doctor testified that he had occasion to treat Sergeant Nash and that the latter had gunshot wounds in his abdomen and lower chest; that he was in complete shock, failed to respond to treatment and died that evening.

The two bullets found in the clothing of Sergeant Nash were testified by a ballistics expert as having been fired, in

his opinion, from the .38 revolver found in the alley outside of the bedroom.

Officer Rafferty had several other conversations with Meyes at the hospital, and in one conversation, which was reported and subsequently reduced to a typewritten transcript, Meyes said that he was in the bathroom between the two bedrooms, Douglas' and Payne's (a man from whom Douglas had subrented a bedroom) when he heard "somebody in a real authority way ask for Bill." He said he then heard footsteps coming back toward the bedroom and he ran into the Payne bedroom. Meyes stated that the law knew he was a "parole violator." Although he admitted having seen a .32 and a .38 revolver several times at Douglas' apartment, he said he hadn't seen the guns that evening and that he didn't know who shot the officer but that it wasn't him.

The police officers brought the two defendants together in their wheelchairs in the hospital and at that time Officer Felber asked defendant Douglas if it was not true that in a previous statement he (Douglas) had told the officers that he was lying on the floor in the front bedroom beside a bed; that there was a gun fired in the room; that he had observed Meyes shoot at the officer and the officer shoot at Meyes in an exchange of gunfire. Meyes then turned to Douglas in his wheelchair and said to him, "Are you going to let me go like that, ride that?" Douglas then stated to Meyes, "You are going to fry, Bennie, and you are not going to take me with you. Tell them the truth; tell them you pulled the trigger." Meyes then stated, "Who went back to get the gun?" Douglas stated to Meyes, "If I had done it, I would tell the truth. Tell them Bennie, the truth, tell them you pulled the trigger, tell them you pulled it." Meyes then made no further reply.

Certain evidence was received with respect to the issue of motive only. Meyes' parole officer testified that he had informed Meyes that he could not change his residence or leave the county unless he received permission from his parole officer and that any changes in employment must be reported to such officer. He was also told that he could not associate with former inmates of penal institutions. He testified that on June 2, 1958, the Adult Authority suspended Meyes' parole and ordered him to return to prison, Meyes having left his employment in Indio and having failed to report his whereabouts. He had left both his job and his residence in Indio without permission.

Testimony, likewise limited only to the issue of motive, was received concerning certain robberies. The first was a robbery of participants in a poker game on June 9, 1958. A witness identified Meyes as having participated therein and having been armed with a drawn pistol. Other witnesses testified to a robbery which occurred July 21, 1958. Three men participated in the robbery, and two were identified as being defendants Meyes and Douglas. Meyes was armed with a gun and during the course of the robbery struck one of the men across the head with the gun. Other witnesses testified to the holdup of a "crap game" on July 25, 1958. Witnesses testified that Meyes participated and was armed at that time. There was no definite identification of Douglas. In this robbery one of the victims was shot through the chest. A shoeshine stand operator testified to a robbery on August 16, 1958, by two armed men. He identified Meyes and Douglas. Another witness testified that Meyes and Douglas were two of the three men who held up a crap game on October 10, 1958.

Defendant Meyes testified in his own behalf. He said that he previously had not told the police officers what had actually happened in the Payne bedroom on the evening Officer Nash was shot. He said that he had been choked and beaten across the throat with a gun barrel in the ambulance ride to the receiving hospital and that he couldn't possibly tell the officers anything that they would be satisfied with. He denied being involved in any robberies after his parole from state prison in June of 1957. He admitted he left Indio and moved to Los Angeles and got a job under a false name because he found he couldn't get a job otherwise.

Meyes testified that he had talked to Douglas on October 19, 1958, about borrowing some money and that Douglas told him if he came around on Monday, October 20, after work he (Douglas) would give him something to pawn; that Herman Cosby, one of the occupants of the apartment on the day of the shooting, picked up Meyes and took him to defendant Douglas' apartment; that Meyes told Douglas he had come by to pick up Douglas' drum and gun to pawn; that Douglas asked Meyes to wait for him; that he and Cosby then went off to a couple of taverns and returned to Douglas' apartment, parking as close to it as they "possibly could"; that after some conversations and some drinking in the front room of the apartment, Douglas told him to come on to the back of the apartment to talk; that Douglas went into the bathroom

and he (Meyes) went into Douglas' bedroom and removed the gun from between the mattresses where he had seen Douglas place it the previous week; that he placed the gun in the waistband of his trousers, approached Douglas in the bathroom and pulled his shirt up and told Douglas he had the gun; that Douglas walked out of the bathroom for a minute and then returned; that shortly after this Meyes said he heard a sound of someone coming down the hallway and that everything was completely silent; that he indicated to Douglas that something was "amiss"; that he told Douglas "it sounds like a man," relating his statement to the heavy footsteps in the hallway; that he moved toward the Payne bedroom followed by Douglas; that Douglas got down alongside the bed in the bedroom and he (Meyes) stood alongside the chest in the bedroom; that he saw the door open 3 or 4 feet and that he observed the light diminishing.

Meyes testified he saw Douglas on the floor and the person who came in the room shot at least once at Douglas and then backed up quickly at which time he (Meyes) tried to come out of his corner intending to leave by the window; that it was at this time he was fired on twice and that he then returned the fire; that the next thing he knew he was diving out through the window after which he lost the gun and a shoe and that he made his way to Herman Cosby's car where he was found and arrested.

Meyes testified that when he was first fired on he did not have the gun in his hand; that when he took the gun out from under his belt and returned the fire he did so because he was afraid for his own life; and that he had had the impression that the gun was loaded when he had seen Douglas move the gun on the previous Sunday because of danger to the children. Meyes denied knowing at the time he fired on the person in the bedroom that such person was a policeman. He also denied having any conversation with police officers in which he used the term "the voice of authority."

Meyes testified that when he was standing by the chest in the Payne bedroom he was frightened. He stated that his state of mind during the shooting was that he was shooting in self-defense. When he was asked concerning the shots fired at the officer, "And is it your testimony that in that state of mind, one shot was fired into the left side, another shot into the left side, another shot fired into the back, and your state of mind is still that you were shooting in self-defense?" Meyes responded, "Yes, it was."

Meyes admitted that his state of mind centered around being in violation of parole; that this kept him on edge all the time and that he would "react" to about any "unusual" situation. He admitted that the only trouble that could come to him would be from law enforcement officers in that he would be taken into custody for violation of parole and returned to state prison. Meyes stated that he still did not expect the police to come into a man's home, but that he preferred to hide until he could find out what was going on after hearing the steps in the hall. When asked to whom he thought the footsteps coming down the hall might belong, Meyes stated, "Well, it is pretty hard to say. I was living in an abnormal life, being a parole violator."

Meyes admitted the three prior felony convictions and that he had violated the terms of his parole. He admitted he knew that Cosby was a convicted felon and that one of the conditions of his parole was that he not associate with a previously convicted felon. He admitted that he changed his residence without permission and that his possession of the gun was also a violation of parole.

Meyes' testimony relating to the conditions of his parole and his violations thereof was limited to the sole purpose of motive for committing the instant crime. Meyes admitted he knew if he were taken into custody as a result of his parole violation he would be returned to state prison for the maximum period of time provided for the offenses of robbery in the first degree and burglary.

Meyes said that when he went into Douglas' bedroom and got the gun and placed it in his belt underneath his shirt that that was the way he was going to transport the gun to the pawn shop for pawning; that he assumed the gun was loaded but it was not his intention to pawn the bullets with the gun; that it never occurred to him to take the bullets out of the gun and to carry it empty to the pawn shop.

Meyes said that his state of mind, when the officers were questioning him following the shooting, was that he was the only one who had survived and that the first he had known that Douglas also had survived was when the officers confronted him with Douglas at the hospital. Meyes claimed that he had been lying to the police when he had said he heard a knock on the front door and a "voice of authority" ask for "Bill," and that he thought he was serving his best interest to tell such lies. He said that some of the statements

he gave to the officers were given to place the blame for the shooting of Sergeant Nash on defendant Douglas.

There was rebuttal testimony by the police officers and ambulance attendants that no officer was seen to choke or did choke defendant Meyes or apply his gun barrel to Meyes' throat; also that no one either cursed him or called him any names. There was testimony on rebuttal pertaining to the other robberies in which it was testified that defendant Meyes participated.

As previously indicated, defendant Douglas was acquitted and defendant Meyes was convicted of murder in the second degree. Meyes bases his appeal upon the following grounds: (1) that he was denied a fair trial in that evidence of other crimes committed by appellant prior to the day of the murder was improperly admitted; that he had not previously been convicted of these crimes and the offenses were in no way related to the offense charged in the indictment; (2) that appellant was denied a fair trial in that erroneous, confusing and prejudicial instructions were given concerning the application of the testimony of such prior offenses and that certain instructions concerning such testimony were wrongfully refused; (3) that improper rebuttal testimony was admitted to the prejudice of appellant; and (4) that appellant was erroneously adjudged an habitual criminal.

The killing of the police officer occurred on October 20, 1958. The other offenses concerning which testimony was received were armed robberies on June 9, 1958, July 21, 1958, July 25, 1958, August 16, 1958, and October 10, 1958. Evidence was also received that appellant had been placed on parole on July 11, 1957, and had violated parole on or about June 2, 1958. The jury was instructed that the evidence of the robberies and the violation of parole was being offered solely to show motive on the part of the appellant for the killing of police officer Nash.

It is a basic principle of law that ". . . 'If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involves the commission of another crime.' [Cases cited.] . . ." (*People* v. *Zatzke,* 33 Cal.2d 480, 484 [202 P.2d 1009].)

In the recent case of *People* v. *Combes,* 56 Cal.2d 135, 147 [14 Cal.Rptr. 4, 363 P.2d 4], the Supreme Court stated, "Obviously each of the crimes which defendant committed in the four days preceding the murder and the statements

made by him in connection with them were relevant on the issues of motive, intent and premeditation. Not only are such acts and statements on the part of defendant relevant and admissible from the standpoint of logic and common sense, but in cases where the victims of murders were police officers who had stopped the defendants for investigation or to arrest them, evidence that the defendants had previously committed serious crimes has always been held properly admitted to prove that the motive for the killing was to prevent arrest and punishment for the crimes they had committed. [Cases cited.]''

In the latter case the defendant, a parolee and several other defendants, also parolees, were shown to have engaged in a series of robberies during the four days preceding the murder. They were stopped at a roadblock and were asked for identification. One defendant had none, the officers asked them to get out of the car and in getting out the defendant shot one of the officers. The series of acts which the defendant committed constituted violations of his parole for which he could have been returned to prison to finish out his unexpired sentence and for which new and separate crimes, if apprehended and convicted, he could be sentenced to new and additional terms in prison. ''As each of these criminal acts was committed, the motive to kill to escape apprehension became stronger, because the possible term in prison increased with the commission of each successive act.'' (*People* v. *Combes, supra,* 56 Cal.2d 135, at p. 147.)

██ ''The quantum of evidence, if it is *relevant* to a fact in issue, does not enter into the question of its admissibility. . . .'' (*People* v. *McMonigle,* 29 Cal.2d 730, 742 [177 P.2d 745].) In the above case the court sustained the trial court's admission of evidence of a theft by defendant of a foot locker containing some distinctive clothing some six weeks prior to the murder charged. In that case the relevancy of the theft was to show proof of ''a design or plan to entice'' on defendant's part through wearing a serviceman's clothing, and while not admitted on the issue of motive it is pertinent here because of its relevancy to a fact in issue and also because in the *Zatzke* case (*People* v. *Zatzke, supra,* 33 Cal.2d 480), as in the case before us, the killing was claimed to have been done in self-defense.

Appellant contends that in the early cases dealing with the admissibility of evidence of other offenses to show motive for the killing the defendants were being pursued for the crimes they had committed and that in each and every case

the victim was identified as a police officer prior to the killing. Appellant states that in the instant case neither was any knowledge conveyed to defendants that they were being pursued or that they were in danger of apprehension or that the person who had entered the darkened bedroom was in fact a police officer. A review of the testimony of appellant indicates that while on the one hand he denied that he knew Officer Nash was in fact a police officer, he admitted that he felt something was amiss when he heard the footsteps coming down the hall and everything else was suddenly completely silent; that he was afraid and that both he and Douglas moved quickly to hide because of that fear. Meyes stated he realized he was a parole violator and that if he were taken into custody he would be returned to state prison for the maximum period of time provided for the offenses of robbery in the first degree and burglary. He acknowledged that his state of mind centered around being in violation of parole and that this kept him on edge all the time; he admitted that the only trouble that could come to him would be from law enforcement officers in that he would be taken into custody.

The evidence of other offenses and of his being in violation of parole was properly received for the purpose of showing motive as limited by the trial court and the jury was properly instructed with respect thereto.[1] Appellant contends that the jury should have been instructed that the prosecution was compelled to prove each offense and participation therein beyond a reasonable doubt. However, such an instruction would have been contrary to the case law of this state. In *People* v. *Lisenba*, 14 Cal.2d 403, 429-430 [94 P.2d 569],

---

[1]Evidence was offered in this case for the purpose of showing that the defendants committed other crimes than the one of which they are accused and for which they are on trial in this action namely, that they aided and abetted and encouraged the commission of certain robberies and an assault with a deadly weapon with intent to commit murder and that at the time in question a defendant was in violation of his parole from the state prison.

Such evidence was received for a limited purpose only not to prove distinct offenses or continual criminality, but for such bearing, if any, as it might have on the question whether the defendants or either of them are innocent or guilty of the crime charged against them in this action.

You are not permitted to consider such evidence for any other purpose, and as to that purpose you must weigh such evidence as you do all other in the case.

The value, if any, of such evidence depends on whether or not it tends to show that the defendants or either of them had a motive for the commission of the offense charged against them in this action. (CALJIC rev. 33, adapted.)

the Supreme Court declared: "Nor do we think that in the present case the prosecution was required, as urged by defendant, to prove the elements of the asserted Colorado crime beyond all reasonable doubt, as would be the case were the defendant standing trial for such asserted earlier offense. In this connection it is declared in *Lund* v. *State,* 207 Ind. 347 [190 N.E. 850, 853], that 'It is only the ultimate material facts to which the rule of reasonable doubt applies. The facts regarding the other transactions were simply evidentiary facts introduced for the purpose of being considered, together with all of the other evidence in the case, upon the question of criminal knowledge and intent; and though the jury may have entertained some reasonable doubt as to some of the other transactions, or some of the other items of evidence, which tend to prove guilty knowledge or intent, if, notwithstanding that fact, and having considered the evidentiary facts, doubtful and otherwise, they were convinced beyond a reasonable doubt of the ultimate fact of guilty knowledge and intent, it is sufficient.' "

"It is true that where evidence of a prior offense is properly admissible under the exceptions to the general rule, it is not necessary to prove all of the elements of that offense beyond a reasonable doubt, as would be the case were the defendant standing trial for it as well as for the crime charged. [Cases cited.] . . ." (*People* v. *Albertson,* 23 Cal.2d 550, 579 [145 P.2d 7].)

". . . The offense charged in the information must be proved to a moral certainty beyond a reasonable doubt. No such stricture is made on evidence of a similar offense. [Cases cited.]" (*People* v. *Consigli,* 105 Cal.App.2d 104, 106 [232 P.2d 526].)

The court in the instant case properly instructed the jury that it was not necessary to prove all of the elements of each of the offenses beyond a reasonable doubt.[2] It correctly

---

[2]Regarding the evidence introduced in this case concerning the commission of offenses, if any, by the defendants other than the one with which they are charged, I instruct you that it is not necessary to prove all of the elements of each of such other offenses beyond a reasonable doubt. It is sufficient if you find that the evidence, if any, concerning other offenses is established by competent proof sufficient to arouse more than a mere suspicion and that such evidence must afford substantial proof that the other offenses, if any, were in fact committed by the defendants or either of them, having in mind all of the other instructions relative to the limited purpose for which such other offenses are to be considered. *People* v. *Lisenba,* 14 Cal.2d 403 [94 P.2d 569]; *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7].

rejected an instruction requested by appellant that they were not to consider the evidence of other offenses unless and until after a consideration of all of the evidence concerning the particular crime or crimes the jury is convinced beyond a reasonable doubt that the defendant or defendants committed such offense or offenses.

The jury was correctly instructed that proof of a motive for an alleged crime is permissible and often is valuable, but never is essential.[3] ▮ When motive is shown by positive evidence or by facts surrounding the act supporting a reasonable inference it then becomes a circumstance, but nothing more than a circumstance, to be considered by the jury. Appellant argues that since "motive is a circumstance" and this is a circumstantial evidence case each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt and that therefore the motive of the appellant had to be proved beyond a reasonable doubt.

Appellant's contention is erroneous because proof of motive is never essential. Thus it does not become one of the chain of circumstances referred to in the instruction properly given by the court pertaining to circumstantial evidence.[4] ▮ Since motive is not an essential link in the chain to prove the defendants guilty of the crime charged, neither are the individual offenses, evidence of which may tend to show motive, essential links required to be proved beyond a reasonable doubt.

Appellant's third ground for appeal is that improper rebuttal testimony was admitted by the court. He directs

[3]Proof of a motive for an alleged crime is permissible and often is valuable, but never is essential. If, after a consideration and comparison of all the evidence, you feel an abiding conviction to a moral certainty that the defendant committed the crime of which he is accused, the motive for its commission becomes unimportant. Evidence of motive is sometimes of assistance in removing doubt and completing proof which otherwise might be unsatisfactory. Motive may be shown by positive evidence or by facts surrounding the act if they support a reasonable inference. When thus proved, motive becomes a circumstance, but nothing more than a circumstance, to be considered by you. The absence of motive is equally a circumstance to be reckoned with, but on the side of innocence, tending to support the presumption of innocence, and to be given such weight as you deem proper. (CALJIC 35.)

[4]When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt. (CALJIC 28.)

this statement to the admission over objection of defendant of the testimony of two witnesses as to one of the robberies (other crimes) which took place on July 25, 1958. This testimony was admitted to rebut the testimony of both defendants that they did not participate in that robbery. The robbery was one previously testified to by another witness in the prosecution's case in chief. Appellant asserts that defendants' reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of any evidence to establish that which defendants would clearly have denied from the start, citing *People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665]. In that case on page 753 the court stated, ". . . Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish defendant's commission *of the crime. . . .*" (Emphasis added.) In this case the court was obviously referring to "the crime" with which the defendant was charged, not to a prior offense, testimony concerning which was admitted as tending to show motive as in the case before us. In the *Carter* case the prosecution produced for the first time in rebuttal a red cap which tied defendant to the commission of the actual killing charged against him. This is in no way analogous to the situation in the case at hand.

In any event, the admission of the rebuttal testimony objected to dealt primarily with the defendant Douglas' participation in the other offenses, the driver's license of one of the victims of the robbery having been found in defendant Douglas' bedroom. This tended to contradict an alibi of defendant Douglas that he had been at his sister's home at the time of the alleged robbery. This rebuttal testimony against defendant Douglas could not have been prejudicial since the jury acquitted him of the murder charge.

There is no indication that appellant Meyes was in any way prejudiced by the rebuttal testimony nor that such testimony was improperly received.

Finally, appellant contends that he was wrongfully adjudged an habitual criminal. He does not question the prior convictions, which appellant admitted and the court found to be true, but raises the issue of whether or not appellant served *separate* terms of sentences in a state prison for each of such convictions. The requirement of section 644 of the Penal Code is that defendant shall have been previously twice convicted

upon charges separately brought and tried and who shall have served *separate* state prison terms therefor.

A full hearing was had on the question of habitual criminality and the Chief Records Officer for the California Department of Corrections was called and testified. From the sentencing records pertaining to appellant it was shown that he entered state prison on January 24, 1948, for his first conviction of burglary in the second degree. He was paroled on January 24, 1950. He was returned to state prison March 24, 1951, with four additional convictions, each of which constituted robbery in the first degree with a prior felony conviction. The Adult Authority refixed the term for the prior burglary conviction (first conviction) on several occasions and on April 25, 1956, it was fixed at three years. That three-year term was started as of January 24, 1948, and, excluding a certain period when his parole was in a state of suspension, it ended as of August 31, 1951. Thus the period of August 31, 1951, to June 3, 1957, was time served for his robbery convictions (second conviction). Meyes was paroled again on June 3, 1957, and his parole was suspended on June 7, 1958. On this latter date his burglary conviction (first conviction) was refixed at 15 years. This act on the part of the Adult Authority is the basis for appellant's contention that all of the time that he has spent in prison since January 24, 1948, has in effect been spent by him on his first conviction for burglary. Therefore he cannot be deemed to have served a separate term for his second conviction.

It would follow then, appellant asserts, that he could not be classified as an habitual criminal because of the requirement heretofore referred to that he must have served separate terms on two of the previous convictions. The records show conclusively, however, that the three-year term for his first conviction, as fixed on April 25, 1956, was completed as of August 31, 1951, from which it follows that he could not have been serving the period from August 31, 1951, to June 3, 1957, on that first conviction, and in fact was serving it on his second conviction. The act of the Adult Authority on June 7, 1958, of refixing the term of his sentence on the first conviction was not ultra vires since a prisoner confined under consecutive sentences must be regarded as undergoing a single continuous term of confinement thereunder for the purpose of redetermination by the Adult Authority of the length of time of his imprisonment. In *In re Cowen,* 27 Cal.2d 637, 645 [166 P.2d 279], the court declared, "Section 3021 of the

Penal Code provides that 'When a prisoner has imposed upon him two or more cumulative or consecutive sentences, the board may determine and redetermine after the expiration of six months of his first sentence, what length of time he shall serve on *all* such cumulative or consecutive sentences' (italics added) without any suggestion that by the passage of time (short of the ultimate end of the entire term) the authority of the board (now the Adult Authority) to redetermine the length of time under some of such cumulative sentences is lost. The word cumulative means 'composed of accumulated parts; formed, or becoming larger, by . . . successive additions' (Webster's New Int. Dict., 2d ed.) and the use of such word by the Legislature in section 3021, apparently as a synonym for consecutive, suggests that the several sentences are to be regarded as a unit in administering the law.'' (See also *In re Byrnes,* 32 Cal.2d 843 [198 P.2d 685].)

In *People* v. *Mangan,* 87 Cal.App.2d 765 [197 P.2d 781], construing the habitual criminal section (Pen. Code, § 644), it was held that the ''separate terms'' referred to in that section are not restricted in meaning to terms which have been fully and completely served. In that case a defendant committed a second offense while on parole from a prior conviction. The term of imprisonment for the second offense was made to run, in part, concurrently with the balance of the term of imprisonment for the first offense. This did not preclude the defendant from being adjudged an habitual criminal, on being convicted for a third offense, on the theory that he did not serve separate terms for the first and second offenses, since parts of two terms constitute ''separate'' terms within the meaning of the code section. In that case when the defendant was returned to prison on a second conviction he had not completed his parole on the first conviction and the second sentence was ordered by the court to run concurrently with the first. Twelve days after he had been returned to prison his sentence on the first conviction expired. Thus, 12 days of the two terms were in fact concurrent, but thereafter, as in the instant case, the time served until his second parole was on the second conviction. Mangan was returned to prison on a third conviction while still on parole for the second conviction. He argued that he had not completed his second term and therefore could not have been deemed to have served two separate terms. However, the court held that the Legislature has not required that *full terms be served.*

The judgment of conviction and the order adjudicating appellant as an habitual criminal are affirmed.

Jefferson, J., and Balthis, J., concurred.

A petition for a rehearing was denied January 8, 1962, and appellant's petition for a hearing by the Supreme Court was denied February 21, 1962.